**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS (SHERMAN DIVISION)**

| | | |
|---|---|---|
| CPIF LENDING, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | C.A. No. 4:19-cv-00124_____ |
| FRISCO WADE CROSSING | : | |
| DEVELOPMENT PARTNERS, LLC, and | : | Instrument No. |
| MCKINNEY EXECUTIVE SUITES AT | : | 20181011001271450 |
| CRESCENT PARC DEVELOPMENT | : | |
| PARTNERS, LLC, and | : | |
| | : | |
| THE UNITED STATES OF AMERICA, | : | |
| | : | |
| Defendants. | : | |

**LENDER'S VERIFIED ORIGINAL PETITION FOR APPOINTMENT OF**
**TEMPORARY RECEIVER AND REQUEST FOR EXPEDITED CONSIDERATION**

CPIF Lending, LLC (the "Lender"), files this Petition against Borrowers Frisco Wade Crossing Development Partners, LLC ("Frisco Wade") and McKinney Executive Suites at Crescent Parc Development Partners, LLC ("McKinney Crescent" and collectively with Frisco Wade, the "Borrowers"), and the United States of America (the "United States") seeking, among other things, **expedited** consideration of its petition (the "Petition") for appointment of a temporary receiver for the real property described below, and respectfully shows as follows:

## I.     NATURE OF THE ACTION

1.     Lender seeks the **expedited** appointment of a receiver to manage the property mortgaged by Borrowers and the facilities thereon. Appointment of a receiver is necessary to protect the value of Lender's collateral which secures the repayment of a construction loan in the original principal amount of $32 million (the "Loan"), as discussed in more detail below.

2.      On November 6, 2018, the sponsor and guarantor of the Loan, Phillip Carter ("Carter" and also referred to herein as "Guarantor"), was indicted by the Grand Jury of Collin County, Texas (collectively, the "Indictments") on multiple counts of securities fraud.  This occurred shortly after the closing on the Loan.[1]

3.      The Indictments — and resulting arrest of Carter — led to a cloud of uncertainty over the construction projects at Frisco Wade and McKinney Crescent, which, together with recent developments, jeopardize the viability of and Lender's first priority security interest in the project, which consists of the construction and sale of condominiums for use by medical and office professionals (the "Project").

4.      Moreover, the involvement of state and federal governmental agencies, including the United States, through the Securities and Exchange Commission (the "SEC"), and the State of Texas, through the Texas State Securities Board, (the "TSSB"), has further jeopardized the viability of and Lender's first priority security interest in the Project.  The United States, through the SEC, and other governmental authorities have asserted a potential interest in the real property that secures Lender's first priority security interest as it alleges potential inchoate lien rights on behalf of the investors purportedly defrauded by Carter.

5.      As a consequence, the Project, has ground to a halt because title companies have refused to underwrite title insurance policies for buyers of these condominiums, given the cloud on title caused by the Indictments issued against Carter.

---

[1]      The Indictments issued by the Texas State Securities Board include: (i) Cause No. 296-83865-2018 for Securities Fraud over $100,000; (ii) Cause No. 296-83866-2018 for Money Laundering over $300,000; (iii) Cause No. 296-83867-2018 for Misapplication of Fiduciary Property over $300,000; (iv) Cause No. 296-83868-2018 for Misapplication of Fiduciary Property over $300,000; (v) Cause No. 296-83869-2018 for Sale of Unregistered Securities; and (vi) Cause No. 296-83870-2018 for Sale of Securities by Unregistered Agent or Dealer.

6.      Construction has now ceased and, given the Indictments, sales of completed condominium units are impossible at this time.  To protect investors and resolve the construction and sales impasse caused by the Indictments, the SEC began preparing to have its own receiver installed over Carter's assets and businesses, including the Project.  This effort, however, was delayed, in part, as a consequence of the federal government shutdown.

7.      On January 18, 2019, just before the conclusion of the federal government shutdown, Carter purportedly relinquished all control over his assets and businesses, including the Project, and installed Lawrence R. Perkins of SierraConstellation Partners LLC, by and through CFO Holdings, LLC, as the Chief Restructuring Officer (the "CRO").

8.      Just before the appointment of the CRO, EMJ Corporation, the general contractor for the Project, advised the CRO of its Notice of Immediate Suspension of All Work and Requirement for Evidence of Funding.  EMJ separately filed mechanics liens against Frisco Wade in the amount of $1,036,601.53 and against McKinney Crescent in the amount of $2,681,107.63 (collectively, the "Mechanics Liens").  A true and correct copy of the Mechanics Liens are collectively attached hereto as **Exhibit A**.

9.      On January 25, 2019, the SEC filed a complaint (the "SEC Complaint") against Carter, individually, as a defendant, and his related entities, including Frisco Wade and McKinney Crescent, among others, as relief defendants.  A true and correct copy of the SEC Complaint is attached hereto as **Exhibit B**.  The SEC Complaint notes that "Carter's continuing cash deficiencies have severely delayed or halted the completion of ongoing real estate development projects."  *See* **Exhibit B** ¶ 51.  The SEC Complaint raises many of the same concerns raised herein including that title companies will not issue title policies, purportedly as a result of Carter's arrest and related uncertainties.  *See* **Exhibit B** ¶ 52.

10.     Shortly thereafter, the CRO contacted the SEC and the Lender, explained their plan to place the Project and other entities owned by Carter into bankruptcy, and eventually sell Carter's assets and the assets of his businesses or restructure Carter's businesses.

11.     Almost one month has passed since the CRO began serving and nothing has happened that would benefit Carter's businesses or the stakeholders in those businesses.  No sales have occurred.  No construction has resumed.  No employees have been paid.  And no bankruptcy has been filed.  Instead, the CRO has used this time to strong-arm the Lender to provide a loan that would, for the most part, financially benefit the CRO and his professionals and not the financial stability of this Project.

12.     When the discussion with the Lender failed, the CRO, upon information and belief, mortgaged unencumbered assets of Carter and his businesses to obtain a senior secured loan exceeding $1 million in order to pay the CRO and the CRO's professionals.  Lender has asked the CRO on several occasions for the documentation evidencing this loan, but those requests have gone unanswered.

13.     The competing interests among the Lender, the government, and, now, the CRO, have placed the Project in peril.  Accordingly, multiple factors support the immediate need for the appointment of a receiver for the benefit of all stakeholders.

14.     ***Competing interests in the Project could seek to impair Lender's first priority security interest.***  The SEC and the TSSB, (the "<u>Governmental Agencies</u>"), are actively involved at the Project post-issuance of the Indictments to protect the interests of the allegedly harmed real estate investors.  The Indictments allege that Carter misapplied real estate investments raised by Carter to his own personal use, and in turn, borrowed funds from Lender to support the Project.  While Lender is sympathetic to the plight of the investors, the intervention of the

4

Governmental Agencies has further complicated the management of the Property. Additionally, upon information and belief, the SEC and the TSSB may assert potential lien rights over the real property that otherwise secures Lender's interest in the Project.

15. ***Unanticipated intervention by Governmental Agencies has halted approval of sales at the Project.*** Moreover, the intervention of the Governmental Agencies has halted sales of properties at the Project, due to their failure to sign off on potential sales, thereby seriously impairing the value of the Lender's collateral.

16. ***Uncertainty as to the effect of the Indictments has caused title companies to cease underwriting title policies, thereby stalling sales at the Project.*** Concerns over title issues at the Project, including potential allegations of constructive trusts and other inchoate liens due to the Indictments against Carter, have caused title companies to cease underwriting sales of properties at the Project.

17. ***Cessation of sales at the Property have halted repayments of the Loan thereby impairing Lender's collateral.*** While Lender has honored certain construction draw requests, in connection with the Project, both pre and post-default, in light of the instability of the Project, and the failure to close on sales of properties in order to repay the Loan, Lender is no longer funding the Project, absent the relief requested from this court and the appointment of a neutral party to oversee the Project for the benefit of all stakeholders.

18. ***Substantial Mechanics Liens have been filed against the Project.*** As discussed above, the general contractor of the Project has advised that it has ceased to do work at the Project due to non-payment, and has filed the Mechanics Liens in excess of $3.5 million against the Project, thereby further impairing Lender's collateral.

19.      ***The installation of the CRO and related professionals has layered additional expenses on an already beleaguered and unstable project.***  As discussed above, the CRO has been installed at the Project for over a month, yet nothing has occurred to advance the viability of this Project – only the layering on of an additional $1 million loan without any real benefit to the Project – as the Project remains in largely the same (or worse) condition than it was one month ago.

20.      The Indictments constitute a Material Adverse Change, which is an Event of Default (as defined in the Loan Documents).  For such reason, Lender previously called a default under the Loan, which default has continued.  The Lender has now accelerated the Loan.

21.      Without the immediate appointment of a receiver for all of the reasons outlined above, Lender's interests will be irreparably harmed.  Consequently, the Court should appoint a receiver to stabilize the Project pending a future sale or other disposition of the Property for the benefit of all stakeholders, as opposed to continuing to operate at their expense.

## II.    PARTIES, JURISDICTION AND VENUE

22.      Lender CPIF Lending, LLC, is a Washington limited liability company with a registered agent address c/o RSC Corporation, 1201 3rd Avenue #3400, Seattle, Washington 98101.  Lender may be served with any pleading in this matter through its undersigned counsel of record.

23.      Borrower Frisco Wade Crossing Development Partners, LLC, is a Texas limited liability company with a registered agent address c/o Nicholas J. Nuspl, 1420 W. Exchange Parkway, Suite 180, Allen, Texas 75013.

24.     Borrower McKinney Executive Suites at Crescent Parc Development Partners, LLC, is a Texas limited liability company with a registered agent address c/o Nicholas J. Nuspl, 1420 W. Exchange Parkway, Suite 180, Allen, Texas 75013.

25.     Under 28 U.S.C. § 2409(a), the United States is named as a party defendant to this action to adjudicate a disputed title to real property in which the United States claims a potential interest.

26.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because, upon information and belief, federal courts can hear "all cases, in law and equity, arising under this Constitution, [and] the laws of the United States . . . ."  U.S. Const. art III, § 2.  The Supreme Court has interpreted this clause broadly, finding that it allows federal courts to hear any case in which there is a federal ingredient.  *See Osborn v. Bank of the United States*, 22 U.S. 738 (1824).

### III.    FACTS

**A.    The Secured Indebtedness**.

27.     Defendant Frisco Wade is the owner in fee simple of land located in the city of Frisco, county of Collin, state of Texas, and legally described on **Exhibit C-1** attached hereto (the "Frisco Land"), together with the improvements located or to be located thereon (the "Frisco Improvements").  The Frisco Land and the Frisco Improvements are collectively referred to herein as the Frisco Project (the "Frisco Project").  The Frisco Project is a mixed-use development consisting of five (5) retail buildings and thirteen (13) office buildings totaling 146,766 square feet.

28.     Defendant McKinney Crescent is the owner in fee simple of land located in the city of McKinney, county of Collin, state of Texas, and legally described on **Exhibit C-2** attached hereto (the "McKinney Land") (together, the Frisco Land and the McKinney Land are, individually or collectively, as the context requires, the "Land"), together with the improvements

located or to be located thereon (the "McKinney Improvements"); (together, the Frisco Improvements and the McKinney Improvements are, individually or collectively, as the context requires, the "Improvements"). The McKinney Land and the McKinney Improvements are collectively referred to herein as the McKinney Project (the "McKinney Project"). The McKinney Project consists of twenty-five (25) separate medical and executive office buildings.

29.     Together, the McKinney Project and the Frisco Project constitute the Project, as described above, under the Loan Documents for which Lender seeks the immediate appointment of a receiver due to the current instability and condition of the Project.

**B.     The Loan**.

30.     On or about September 27, 2018, Borrowers entered into that certain Construction Loan Agreement (as amended or modified, the "Loan Agreement") with Lender pursuant to which Lender agreed, among other things, to loan Borrowers the principal amount of $32,000,000.00 (the "Loan") to refinance and complete the construction of the Project in exchange for Borrowers' agreement to, among other things, repay the Loan with interest. A true and correct copy of the Loan Agreement is attached hereto as **Exhibit D**.

31.     Simultaneously with the execution and delivery of the Loan Agreement, Borrowers made, executed, and delivered to Lender a Promissory Note dated November 8, 2017, in the original principal amount of $32,000,000.00 (as amended or modified, the "Note") evidencing the Loan made to Borrowers. A true and correct copy of the Note is attached hereto as **Exhibit E**.

32.     Borrowers are in default under the Loan.

33.     By correspondence dated November 14, 2018 (the "Default Letter"), Lender notified Borrowers of their defaults under the Loan because (i) a Material Adverse Change had occurred as a result of the Indictments, and (ii) Borrowers had breached certain representations

and warranties under the Loan Agreement.  A true and correct copy of the Default Letter is attached hereto as **Exhibit F**.  As a result, Default Interest[2] automatically began to accrue. Separately, as a result of the defaults, Guarantor's obligations to pay or perform the Guaranteed Obligations (as defined in the Guaranty)[3].

34.    As of February 15, 2019, Borrowers owe Lender a total of $24,750,951.75 under the Note.[4]

35.    None of the above amounts have been paid.

36.    Lender has faithfully and in good faith fulfilled all of its obligations to Borrowers and has otherwise performed all acts necessary to preserve all of its rights under the Note and accompanying Loan Documents.

**C.    The Deed of Trust**.

37.    As security for the Loan, Borrowers entered into a Deed of Trust, Assignment of Leases and Rents, Assignment of Contracts, Security Agreement, and Fixture Filing dated September 27, 2018 to secure Lender's interests in the Property, including, but not limited to, the Project (the "Deed of Trust").

---

[2]    Capitalized terms not otherwise defined herein shall have meaning ascribed to them in Loan Agreement.

[3]    On September 27, 2018, Lender entered into a Payment and Performance Guaranty (the "Guaranty") with Phillip Carter, individually and on behalf of his marital community ("Carter"), Phillip Carter, as Trustee of the PC Legacy Three Trust, and Phillip Carter, as Trustee of the Legacy Four Trust.  A true and correct copy of the Guaranty is attached hereto as **Exhibit G**.

[4]    On February 13, 2019, Lender informed Borrower and Guarantor that it had accelerated the Loan and that all reserves established by Lender in accordance with the Loan Documents were applied to all amounts due from Borrower to Lender, with the exception of the Servicing Reserve.  A true and correct copy of that correspondence is attached hereto as **Exhibit H**.

38.     The Deed of Trust was recorded with the Recorder of Deeds of Collin County, Texas as Instrument No. 2018011001271450, on October 11, 2018.  A true and correct copy of the recorded Deed of Trust is attached hereto as **Exhibit I**.

39.     The Deed of Trust creates a valid and enforceable lien against the Property in favor of Lender.

**D.     The Financing Statements**.

40.     In connection with the Loan Agreement, Lender filed several financing statements to secure its interest in the Property.

41.     On November 15, 2018, Lender filed a financing statement with the Texas Secretary of State against Frisco Wade (the "Frisco Wade UCC-1").  A true and correct copy of the Frisco Wade UCC-1 is attached hereto as **Exhibit J**.  The Frisco Wade UCC-1 secures Lender's right, title, and interest in and to all of the assets, properties, and rights of the Debtor, consisting of all corporate and business assets, properties, and rights of the Debtor located at those certain pieces or parcels of real property located at the Project whether now owned or hereafter acquired or arising, and all proceeds, products, and accessions thereof.

42.     On November 15, 2018, Lender filed a financing statement with the Texas Secretary of State against McKinney Crescent (collectively, the "McKinney Crescent UCC-1" and with the Frisco Wade UCC-1, the "State UCC-1s").  *See* **Exhibit J**.  The McKinney Crescent UCC-1 secures Lender's right, title, and interest in and to all of the assets, properties, and rights of the Debtor, consisting of all corporate and business assets, properties, and rights of the Debtor located at those certain pieces or parcels of real property located at the Project whether now owned or hereafter acquired or arising, and all proceeds, products, and accessions thereof.

43.     Lender separately filed a financing statement with the Collin County Clerk of Courts to further secure its right, title and interest in and to its interest in the Project (the "County UCC-1").  A true and correct copy of the County UCC-1 is attached hereto as **Exhibit K**.

**E.     The Borrowers' Defaults and the Dire Effect of the Indictments on the Project.**

44.     The Lender entered into the Loan Agreement to allow the now indicted Carter – through the Borrowers – to refinance and complete the construction of the Project.  Less than a month and a half after closing on the Loan, with construction of the Project incomplete, Guarantor Carter was indicted on, among other things, multiple counts of securities fraud and related crimes as discussed at the outset of this Petition.   True and correct copies of the Indictments are attached hereto collectively as **Exhibit L**.  Subsequent to the issuance of the Indictments, Carter was arrested on November 13, 2018 to face criminal charges in connection with allegedly raising $17.5 million from nearly one hundred investors for real estate projects in Texas.   Instead, Carter purportedly used those investor funds for unrelated purposes, including paying personal expenses and satisfying a personal IRS tax lien.   *See* https://www.ssb.texas.gov/news-publications/north-texas-developer-indicted-alleged-17-million-real-estate-fraud (Nov. 14, 2018), attached hereto as **Exhibit M**.  Based upon the foregoing, Lender issued the Default Letter due to a Material Adverse Change.  *See* **Exhibit F**.  While the Lender has always supported the Project (by honoring construction and operational draw requests in the amounts of approximately $7.3 million pre-default and approximately $1.1 million post-default) to allow for payments to vendors, and contractors, among others, at the Project, the uncertainty caused by the Indictments has placed the Project in jeopardy risking serious impairment to the Lender's collateral.

45.     By way of example, the Indictments have led to:

11

- The intervention by Governmental Agencies on behalf of the harmed investors which has stalled sales of properties at the Project.  Currently, multiple sales contracts at the Project have stalled, as the governmental agencies are not willing to approve the sales of properties at the Project in light of the Indictments.

- Title companies are not willing to underwrite title policies for the sales of properties at the Project given the Indictments and concerns over potential inchoate liens and constructive trust claims.

- The affected investors have already retained securities class action counsel which could further affect Lender's interests at the Project by intertwining the Project in protracted litigation.

In light of the foregoing, while the Lender has previously honored the construction draw requests made by the Borrowers, the Lender can no longer fund draw requests.

46.     Moreover, Borrowers have breached the Loan Documents and an Event of Default has occurred, and continues to occur, entitling Lender to exercise any and all remedies available pursuant to the Loan Documents.

**F.**     ***The Appointment of the CRO has Caused Further Deterioration of the Project***.

47.     As set forth above, since installation as CRO as the Project a month ago – little to no constructive activities have occurred that would serve to benefit the stakeholders having an interest in the Project.  Despite being told that a bankruptcy filing was imminent, no filing has incurred.  At the same time, upon information and belief, the CRO and his professionals have incurred significant professional fees and expenses, and mortgaged previously unencumbered assets of the Guarantor (in an amount exceeding $1 million), to pay for them.  All while at the same time, construction at the Project has ground to a halt and an additional $3.5 million in Mechanics Liens have been filed against the Project.

48.     The CRO, to date, has done nothing to preserve the value of the Project.  For such reasons, it is imperative that an independent neutral party be installed at the Project for the benefit of all stakeholders.

## IV.    CAUSES OF ACTION

**A.    Breach of Contract.**

49.    Lender incorporates by reference all of the paragraphs above and below to the extent they are consistent herewith.

50.    Borrowers are in default under the Loan due to the Event of Default arising, among other things, from the occurrence of the Material Adverse Change.

51.    Accordingly, Lender is entitled to pursue all remedies available to Lender (i) under the Loan Documents, and (ii) at law or in equity, and must do so at this time to protect the value of Lender's collateral.

**B.    Attorneys' Fees.**

52.    Lender incorporates by reference all of the paragraphs above and below to the extent they are consistent herewith.

53.    Because of Borrowers' actions, Lender has found it necessary to engage the law firms of Benesch, Friedlander, Coplan & Aronoff LLP as lead counsel and Foley Gardere as local counsel to prosecute this action and to protect its rights.  Pursuant to the terms of the Loan Documents and Texas Civil Practice and Remedies Code section 38.001, *et seq.*, Lender is entitled to recover its reasonable and necessary attorneys' fees incurred in the prosecution of this action.

## V.    APPLICATION FOR APPOINTMENT OF TEMPORARY RECEIVER

54.    Lender incorporates by reference the allegations set forth above as if set forth fully herein.

55.    Pursuant to § 64.001, *et seq.*, of the Texas Civil Practice and Remedies Code, Lender seeks appointment of a receiver on both equitable and contractual grounds, as shown

herein.  Lender has standing to seek appointment of a receiver because Lender holds a secured

lien on the Property.  Tex. Civ. Prac. & Rem. Code § 64.001(a)(2).

**A.**     **Contractual Right to Appointment of a Receiver.**

56.     In the Deed of Trust, Borrowers agreed to appointment of a receiver following an

Event of Default.  Specifically, § 7.3.3 of the Deed of Trust provides:

> Lender "shall, as a matter of right, without notice  and without giving bond to
> Grantor or anyone claiming by, under, or through Grantor, and without regard to
> the solvency or insolvency of Grantor or the then-value of the Property or any
> other collateral for the Secured Obligations, be entitled to have a general or
> custodial receiver appointed for all or any part of the Property, and the proceeds,
> issues and profits thereof.  Such receiver shall have all powers and duties
> prescribed by applicable Laws, all other powers that are necessary or usual in
> such cases for the protection, possession, control, management and operation of
> the Property, the right and power to sell the Property, such rights and powers as
> Beneficiary would have, upon entering and taking possession of the Property, and
> such other rights and powers as the court making such appointment shall
> confer.  Grantor hereby irrevocably consents and agrees to the appointment of
> such receiver with such rights and powers and shall not oppose any such
> appointment.

*See* **Exhibit I**.

57.     Accordingly, because an Event of Default exists under the Loan Documents and

is continuing, Lender is contractually entitled, and Borrowers have consented, to the appointment

of a receiver for the Property.  Moreover, Borrowers' clear and unambiguous agreement to

appointment of a receiver is enforceable under Texas law, which governs interpretation of the

Deed of Trust.[5]

---

[5]     *See* **Exhibit I** at § 9.1.8 (stating that Texas law governs); *see also Riverside Property v.
Teachers Ins. & Annuity Ass'n of America*, 590 S.W.2d 736, 738 (Tex. Civ. App.—
Houston [14th Dist.] 1979, no writ) (holding that provisions in deed of trust and security
agreements calling for appointment of a receiver pending foreclosure, while not binding
on the court as a matter of Texas law, were adequate to support a trial court's order
appointing receiver); *Fannie Mae v. U.S. Property Solutions, LLC*, Cause No. 08-3588,
2009 WL 1172711, at *1 (S.D. Tex. Apr. 28, 2009) (noting that the court appointed
receiver "[b]ecause the Note explicitly provided for the appointment of a receiver in the

**B.**    **Equitable Grounds for Appointment of Receiver.**

59.    This Court should also appoint a receiver because the equitable factors for appointment weigh heavily in Lender's favor.  Under Texas Civil Practice & Remedies Code § 64.001(b) and (c), appointment of a receiver for real property is warranted where (a) the property is in danger of material injury; and (b) a condition of the mortgage has not been performed and the property is probably insufficient to discharge the mortgage debt.

60.    Both factors are present here.  *First*, the Indictments have led to a Project which is in limbo, this has caused and will continue to cause damage to the Lender's collateral that cannot be remedied with money damages alone or by an equitable remedy besides receivership. Once appointed, the receiver will gain access to the Property and can manage the competing interests in the Property, in light of the Indictments and ensure the orderly operation of the Project for the benefit of all interested parties.  *Second,* it is clear that certain provisions and condition of the mortgage have not been performed.  Thus, the equitable factors support immediate appointment of a receiver.

61.    Furthermore, legal remedies other than appointment of a receiver will not suffice to protect Lender's interests in the Property; no less drastic equitable remedies exist.  *See Russ-Ann Development, Inc. v. ECGC, Inc.*, 322 S.W.3d 921, 927 (Tex. App.—Tyler 2007, no pet.) ("In Texas, the potential loss of rights in real property is a probable, imminent, and irreparable injury that qualifies a party for a temporary injunction.").

62.    The urgent issues described above cannot be solved with money damages alone or any other equitable remedy.  These unusual and troubling circumstances mandate that a suitable receiver be appointed that is independent of the Borrowers to operate and manage the Project in a

---

event of default . . . "); *Franchise Loan Trust 1998-1 v. S&A Fee Property SPE 2, LLC*, Cause No. 08-306, 2008 WL 4093620, at *1 (E.D. Tex. Aug. 26, 2008).

professional manner, to oversee and consummate sales of properties at the Project, and to seek to resolve any possible issues related to the continuing construction of the Project while the real estate market is in its current condition.  Stalling the Project, and sales of properties at the Project, could seriously impair all interests in the Project should the real estate market decline.

63.    Borrowers will not suffer harm if this Court appoints a receiver.  *First*, Borrowers have already agreed to the appointment of a receiver for the Property in the Loan Documents. *Second*, the appointment of a receiver for the Property will merely remove some of Borrowers' responsibilities and authority.  Ultimately, the harm suffered by Lender by not appointing a receiver clearly outweighs any harm to Borrowers from appointment of such receiver.

64.    Finally, Lender will likely succeed in the underlying action for breach of contract, as it is undisputed that Events of Default have occurred.

**C.    The Proposed Receiver.**

65.    The Court should appoint David Wallace of Trigild, as receiver for the Property. Based in Dallas, Texas, Mr. Wallace acts as general counsel for Trigild and oversees Trigild's entire legal team, including handling court-ordered receiverships for commercial, multi-family, convenience and gas, hospitality and other asset classes across the country, including in circumstances, such as here, where a project is mid-construction.  He also resolves distressed loans and preserves assets as a court-appointed fiduciary.

**D.    Receiver's Duties and Powers.**

66.    Lender therefore respectfully prays for the following relief with respect to the appointment of a temporary receiver:

a.    David Wallace is appointed receiver ("Receiver") effective immediately with respect to the Property and with respect to income of any kind therefrom, whether now

existing or thereafter collected, and with respect to any and all other property and property interests granted, pledged and/or assigned under the Loan Documents, as defined in this Petition.

        b.     That Receiver be authorized, subject to the control of this Court and the laws regarding receivership, to do any and all acts necessary to the proper and lawful conduct of the receivership; specifically, that the following acts and powers (collectively, the "Receiver's Powers") be authorized and ordered with respect to the Receiver and with respect to the Property (and Lender reserves the right to make future requests that the Court expand the Receiver's Powers should the same be deemed necessary):

        i.    **Receiver's Exclusive and Complete Control over the Property**. Receiver is authorized to take and have complete and exclusive control and possession of the Property, together with any and all bank accounts, credit card receipts, demand deposits, reimbursement rights, bank deposits, security deposits and all other forms of accounts, accounts receivable, payment rights, cash and cash equivalents, along with any and all information necessary to operate the Property and/or as associated with the ownership of the Property, including, but not limited to, all security codes, combinations, passwords and other access codes, and all other collateral securing the indebtedness owed to Lender pursuant to the Loan Documents;

        ii.   **Items to be Delivered to Receiver by Borrowers**. Borrowers and all persons acting under their direction, including any agents of Borrower (including any property manager), are ordered to deliver possession of the Property to the Receiver, including all property-related information, without any right of offset or recoupment, along with all other collateral securing the indebtedness owed to Lender pursuant to the Loan Documents, including, but not limited to: (i) cash collateral (whether consisting of cash on hand, cash in any and all bank accounts or other accounts, all rights to security deposits, including, but not limited to, amounts that Borrower or its agents may have deposited with utility companies, and all other cash and cash equivalents); (ii) all keys and key cards; (iii) all loans and communications and correspondence files relating thereto; (iv) security deposits; rent; prepaid rent; other sums relating to the use, enjoyment, possession, improvement, or occupancy of all or any part of the Property; and any accounts of any of the foregoing; (v) any and all accounts receivable and accounts payable reports; (vi) any and all contracts in effect with

respect to the Property and all communications and correspondence pertinent thereto; (vii) any and all contracts, bids, or other materials relating to any contractor work at the Property; (viii) any and all payroll records, employee files, applications, and other materials relevant to those persons employed at the Property; (ix) any and all insurance policies and certificates covering the Property, and all communications and correspondence pertinent thereto; (x) any and all bank statements relating to any accounts associated with the Property; (xi) titles to all vehicles operated in connection with the Property; (xii) tax ID numbers for the Borrower; and (xiii) any and all other records pertaining to the management and operation of the Property;

iii.  **Borrowers' Actions**. Borrowers, their agents, and any persons acting under Borrower's direction (including any property manager) are (i) directed to deliver the Property to Receiver; (ii) enjoined from in any way disturbing the possession of the Property or other property that is the subject of this Order; (iii) prohibited and restrained from disposing of, dissipating, mishandling, or misappropriating the Property or other such property; (iv) prohibited from taking any actions that would, directly or indirectly, have an adverse impact on the value of the Property; (v) prohibited and restrained from canceling, reducing, or modifying any and all insurance coverage in existence with respect to the Property; (vi) prohibited and restrained from collecting any rents, profits, or proceeds from the Property, or other sums due to Borrower or its agents, all until further order of the Court; and (vii) directed to disclose to the Receiver any personal property and/or any furniture, fixtures, and/or equipment that has been removed from the Property within the ninety (90) days preceding entry of this Order;

iv.  **Receiver's Right to Prevent Waste of, and to Preserve, the Property**. Effective immediately, Receiver is ordered to take any and all actions Receiver deems reasonable and appropriate to prevent waste of the Property and to preserve, secure, manage, maintain, and safeguard the Property and all other forms of property to which Receiver is entitled to take possession and control under the Court's Order appointing Receiver;

v.  **Receiver Access to Information Related to the Property**. Receiver shall have access to all books and records of Borrowers and its agents regarding operation of the Property, including any and all information related to: (i) rent rolls and leases affecting the Property; (ii) amounts paid by obligors of Borrower; (iii) liens, encumbrances, and other interests against or affecting the Property; (iv) property taxes owed by Borrowers or their agents, including

18

the status of any tax appeal; (v) all types of insurance policies in effect with respect to the Property; (vi) plans, specifications, surveys, and drawings of the Property; (vii) access codes to the Property; (viii) all operating and bank statements of Borrowers or their agents; and (ix) all other aspects of the Property;

vi.　　**Receiver's Right to Manage, Maintain, and Operate the Property**. Receiver is authorized to continue to manage and operate the Property, including to continue construction thereon, to market the Property and to employ such managers, agents, employees, servants, accountants, and attorneys as may in Receiver's judgment be advisable or necessary in the management, conduct, control, or custody of the affairs of Borrowers or their agents and its assets; is authorized to make (or not make, if the Receiver deems it justified) payments and disbursements in the ordinary course of business and to make such payments and disbursements as may be needed and proper for the preservation of the Property and other property of Borrowers or its agents; and is directed to pay net income from the Property to Lender, in reduction of the indebtedness owed to Lender by Borrowers;

vii.　　**Receiver Authorized to Sell the Property**. With the approval of the Court and the Lender, Receiver is hereby authorized to take any and all actions necessary to effectuate a sale of the Property, with or without an assignment and assumption of the Loan and the Loan Documents, including, but not limited to, entering in to any purchase and sale agreements and other related documents; provided that nothing stated herein shall preclude Lender from electing to post the Property for a nonjudicial foreclosure sale and conducting that sale, without prior permission from the Court;

viii.　　**Receiver's Authorization to Lease**. Receiver may negotiate with any and all persons concerning the leasing and/or occupancy of the Property, including all personal property and/or collateral used in, or associated with, the ownership and operation of the Property or any portion or portions thereof;

ix.　　**Receiver's Right to Collect Amounts Due**. Receiver is authorized to receive and collect any and all sums due or owing to Borrowers in any manner related to the Property, including any rents and revenues from the Property, whether the same are now due or shall hereafter become due and owing, to deposit such sums into an account established and maintained by Receiver, without regard to any cash management agreement between Lender and the Borrowers, and to expend sums on the operation and management of the Property, as is necessary and appropriate, in the ordinary course of its business;

x.     **Legal Actions Related to the Property**. Receiver is authorized to institute, prosecute, defend, compromise, and/or intervene in, or become a party to, such actions or proceedings in state or federal courts necessary for the protection, maintenance, and preservation of the Property and to carry out the terms of the Order, including but not limited to, the removal of hotel guests or other persons from the Property, and/or the defense against any action brought against Receiver acting in such capacity;

xi.     **Insurance**. Receiver is authorized to maintain appropriate property insurance for the Property, public liability insurance, worker's compensation insurance, fire and extended coverage insurance, burglary and theft insurance, and other types of insurance normally obtained in connection with the operation and management of the Property; and is authorized to continue any current policies in place and to purchase further insurance as Receiver deems appropriate;

xii.     **Payment of Property Taxes; Preparation and Filing of Tax Returns for the Property**. Receiver is authorized to pay all current and past due real estate taxes, personal property taxes, and any other taxes and assessments against the Property;

xiii.     **Property Protection Advances from Lender**. Receiver and Lender are authorized to enter into further lending transactions by which Lender may, in Lender's sole and absolute discretion, lend monies to Receiver (on a nonrecourse basis as to Receiver) to enable Receiver to perform its duties hereunder, will be secured by the existing liens, security interests, terms, and provisions contained within the Loan Documents;

xiv.     **Payment of Utilities; Maintaining the Property; Compliance with Laws**. Subject to paragraph (xv), the Receiver is authorized to (i) negotiate and enter into new leases, occupancy agreements, and contracts in the ordinary course of the business of the Property; (ii) modify existing leases, occupancy agreements, and contracts in the ordinary course of the business of the Property; (iii) pay all utilities, expenses, and other obligations secured by the Property or which may give rise to liens on the Property, and all other outstanding obligations to suppliers and service providers in the ordinary course of business, including obligations incurred prior to the commencement of the receivership, so long as Receiver has determined that it is prudent to do so in order to maintain business relationships that are beneficial to the Property or the conduct of the receivership; (iv) make repairs necessary to the maintenance of the Property in order to preserve the Property in the ordinary course of business; and (v) comply with all

20

requirements and regulations applicable to the Property; for the avoidance of doubt, each of the actions permitted pursuant to the foregoing subprovisions (i) through (v) is to be taken, or not taken, in the Receiver's sole and absolute discretion, and, without limitation of the foregoing, Borrowers, any property manager, and all those acting in active participation or concert with them who receive notice of this Order, and all those having claims against the Property and any other property in Receiver's possession who receive notice of this Order are enjoined from, and shall not, terminate or withhold any electric, gas, water, sewer, telephone, or other utility service supplying the Property or any other property in Receiver's possession, require return or refund of any utility deposit, or otherwise interfere with the continued operations of the Property or any other property in Receiver's possession; further, each utility company or entity providing service to the Property shall forthwith transfer any deposits which it holds relating to the Property to the exclusive control of Receiver and shall be prohibited from demanding that Receiver deposit additional funds in advance or satisfy obligations incurred prior to the date of this Order to maintain or secure such service;

xv.    **Application of Income from the Property**. Receiver is directed to apply income from the Property, subject to the lien and security interest rights of Lender, as follows: (i) Receiver's approved fees and expenses; (ii) the current operating expenses of the Property in the ordinary course of business; (iii) the obligations owed to Lender under the Loan Documents; and (iv) such other obligations incurred;

xvi.    **Receiver's Cash on Hand**. Receiver is permitted to maintain sufficient cash on hand to enable Receiver to meet the expenses set forth in subparagraph (xiv) above, the payment of which is authorized herein, in an amount to be agreed to between Receiver and Lender;

xvii.    **Payment of Property Expenses**.  Receiver is permitted to pay all expenses incurred with regard to the Property in the normal and ordinary course of business of the Property by Receiver on or after the date Receiver is appointed, including but not limited to franchise fees and associated expenses.  Neither Receiver nor Lender shall be liable for any expenses incurred with regard to the Property prior to Receiver taking possession of the Property, nor shall Receiver or Lender be required to use any rents or additional funds advanced by Lender or other revenues collected after Receiver takes possession of the Property in payment of such expenses.  Notwithstanding the foregoing, Receiver may, in Receiver's sole and absolute discretion, pay those expenses that

21

were incurred in the normal and ordinary course of business of the Property and that were incurred prior to Receiver taking possession of the Property, if, and only if, the payment of any such pre-existing expenses is necessary and critical to the ongoing operation of the Property (e.g., utilities). It shall be incumbent upon Receiver, in Receiver's sole and absolute discretion, to make a determination as to which expenses, if any, incurred prior to the Receiver's taking possession of the Property, were incurred in the normal and ordinary course of business and the payment of which is necessary and critical to the ongoing operation of the Property. Receiver's determination of such is binding on the parties hereto and will not be overturned by this Court. Otherwise, no pre-existing expenses shall be paid by Receiver without written approval by Lender or further order of this Court;

xviii. **Receiver's Liability**. Except in the event of gross negligence, willful misconduct, or actions in violation of orders of the Court, Receiver has no personal liability for any obligations incurred in the course of the receivership, any and all such liabilities being limited to the assets (including the cash and cash equivalents) received and generated by Receiver in the course of the receivership, subject to the existing lien of Lender, and Borrowers agree to hold Receiver harmless except in connection with any willful misconduct or gross negligence by Receiver;

xix. **Receiver's Authority**. The authority granted to Receiver is self-executing; and

xx. **General Authority**. The Receiver is authorized to take any and all actions necessary to preserve the income to and value of the Property; and to perform any other acts in regard to the Property as authorized by this Court.

67.    In addition to any financial, operating, and other reports and information required to be delivered pursuant to the Loan Documents, Receiver shall prepare and file in the record of the above-captioned case, no later than the twentieth (20th) day of each calendar month, beginning the month following appointment of the Receiver, each of the following with respect to the immediately preceding calendar month, certified by Receiver as true, correct, and complete:

a.    a balance sheet and statement of cash flows for the Property;

b.    comparison of budgeted (by the Receiver) and actual income and expense statement for the Property, including a detailed occupancy report for the Property, setting forth the occupancy rates, average daily room rates and room revenues for each calendar month, and such other information as may customarily be reflected thereon, in detail reasonably satisfactory to Lender;

c.    an aged payables report and an aged receivables report for the Property;

d.    a capital expenditure report for the Property; and

e.    all bank statements with monthly reconciliations.

68.    Lender and the Receiver are willing to post bonds in connection with appointment of a Receiver, as directed by the Court.

## VI.    CONDITIONS PRECEDENT

69.    Lender has satisfied all conditions precedent for bringing this action.

## VII.    PRAYER FOR RELIEF

Therefore, Lender respectfully requests the following relief:

70.    That the Court appoint David Wallace, as Receiver to take temporary possession of the Property with responsibilities and authorities consistent with the Receiver's Powers as set forth herein and in accordance with the terms of the proposed order submitted with this Petition; and

71.    On final trial hereof, Lender have judgment against Borrowers for their actual damages as provided in the Loan Documents, and interest to the extent allowed by applicable law, together with its reasonable and necessary attorneys' fees and all costs of court, and such other amounts as provided for in the Loan Documents, and further relief, both general and special, at law or in equity, to which Lender may be justly entitled.

72.    That the Court grant any such other, general, or different relief to which Lender may be entitled.

WHEREFORE, Lender respectfully requests that this Court grant the relief requested in this Petition and such other relief as may be just and proper.

Dated: February 15, 2019

**FOLEY GARDERE**
**Foley & Lardner LLP**

*/s/ Jason B. Binford*
Marcus A. Helt (TX 24052187)
Jason B. Binford (TX 24045499)
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone:  214.999.3000
Facsimile:  214.999.4667

-and-

**BENESCH, FRIEDLANDER,**
**    COPLAN & ARONOFF LLP**

Michael J. Barrie (No. 85625)
Jennifer R. Hoover (No. 87910)
One Liberty Place
1650 Market Street, 36th Floor
Philadelphia, PA  19103-7301
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
mbarrie@beneschlaw.com
jhoover@beneschlaw.com

*Counsel to Lender*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document was served on February 15, 2019 on the parties listed below via e-mail.

*/s/Jason B. Binford*
Jason B. Binford

Joe Wielebinski
**WINSTEAD PC**
2728 N. Harwood Street, Suite 500
Dallas, Texas 75201
jwielebinski@winstead.com
*Counsel for CFO Holdings, LLC, as Chief Restructuring Officer*

James Whalen
**WHALEN LAW OFFICE**
9300 John Hickman Parkway, Ste. 501
Frisco, TX 75035
jwhalen@whalenlawoffice.com
*Counsel for Borrowers*